

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
HASAN VAUGHAN,

                            Plaintiff,                                    11-CV-3097(SJF)(ARL)
                                                                         **OPINION & ORDER**
            -against-

NASSAU COUNTY CORRECTIONAL CENTER,
MICHAEL SPOSATO, *Acting Sheriff,* NASSAU
UNIVERSITY MEDICAL CENTER, INMATE                              **FILED**
GRIEVANCE UNIT SERGEANT, MAIL ROOM                         IN CLERK'S OFFICE
SERGEANT, LAW LIBRARY SERGEANT, FOOD                   U.S. DISTRICT COURT E.D.N.Y
ADMINISTRATION SUPERVISOR, HOUSING UNIT
MAINTENANCE SUPERVISOR, COMMISSARY                     ★   SEP 08 2011   ★
SUPERVISOR, OFFICER HUES, OFFICER BOID,
OFFICER HARVEY, OFFICER KAHL,
MR. O'KANTA, *Medical Supervisor,* OFFICER VEGA,           LONG ISLAND OFFICE
OFFICER HARDY, SERGEANT GEHI, *E1G Unit,*
CORPORAL ANDERSON, SENIOR NURSE KIM
EDWARDS, "OFFICER, BADGE NO. 2783," and
"OFFICER G.",

                                                  Defendants.
-----------------------------------------------------------------X
FEUERSTEIN, J.

I.      Introduction

        On June 27, 2011, incarcerated *pro se* plaintiff Hasan Vaughan ("plaintiff") filed a

complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") against defendants Nassau County

Correctional Center ("NCCC"); Michael Sposato ("Sposato"), Acting Sheriff of the NCCC;

Nassau Health Care Corporation ("NHCC"), s/h/a Nassau University Medical Center

("NUMC")[1]; Sergeant Miller ("Sgt. Miller"), s/h/a the NCCC Inmate Grievance Unit ("IGU")

_____

        [1] NUMC is one of the facilities managed by the Nassau Health Care Corporation
("NHCC"), a public benefit corporation created under New York law, see N.Y. Pub. Auth. Law
§§ 3400-3420.  Thus, plaintiff's claims against NUMC are construed to be claims against NHCC.



Sergeant [2]; the NCCC Food Administration Supervisor; Sergeant Camanitti ("Camanitti"), s/h/a

the NCCC Housing Unit Maintenance Supervisor, Commissary Supervisor, Mail Room Sergeant

and Law Library Sergeant, (Compl., ¶¶ 14-16)[3]; Correctional Officers Hues ("Hues"), Boid

("Boid"), Harvey ("Harvey")[4], Kahl ("Kahl"), Vega ("Vega") and Hardy ("Hardy"); Mr. O'Kanta

("O'Kanta"), as medical supervisor; Sergeant Gehi ("Gehi"), of the NCCC's E1G Unit; Corporal

Anderson ("Anderson"); Senior Nurse Kim Edwards ("Edwards"); and two (2) additional

correctional officers identified only as "Officer Badge No. 2783" and "Officer G." (collectively,

"defendants"), accompanied by applications to proceed *in forma pauperis* and for the

appointment of *pro bono* counsel.  For the reasons set forth herein, plaintiff's application to

proceed *in forma pauperis* is granted, his application for the appointment of *pro bono* counsel is

denied and the complaint is *sua sponte* dismissed in part.


II.      The Complaint

Plaintiff alleges that following his arrest by United States Marshals on September 22,

---

[2] Although Sergeant Miller is not named in the caption of the complaint, the caption designates the IGU Sergeant as a defendant, plaintiff refers to Sgt. Miller in the complaint, (Compl., ¶ 11), and plaintiff identifies Sgt. Miller as the IGU Sergeant in the affidavit he submits in support of the complaint, which the Court construes as a supplement to the complaint (Supp. Compl., ¶ 10).  Accordingly, the caption of the complaint shall be amended to name Sergeant Miller as the IGU Sergeant.

[3] The Clerk of the Court is directed to amend the caption of the complaint to substitute Sergeant Camanitti in place of the defendants designated as the Mail Room Sergeant, Housing Unit Maintenance Supervisor, Commissary Supervisor and Law Library Sergeant.  (See Compl., ¶¶ 14-16; Supp. Compl., ¶ 11).

[4] Plaintiff spells this defendant's name differently throughout the complaint.  For clarity, the Court will consistently spell the name "Harvey".

2



2009 for a purported violation of his federal supervised release, he was brought to the NCCC medical department, where he informed two (2) officers that he "was in no condition to be in such a place as NCCC" because he had suffered third degree burns on over fifty-two percent (52%) of his body only forty (40) days earlier. (Compl. at ¶ 23; Supp. Compl., ¶¶ 21-22). According to plaintiff, the two (2) officers informed him that there was no doctor on duty at the NCCC at that time and they had no authority to send him to the NUMC, and plaintiff was examined by a nurse assigned to the NCCC medical unit, who allegedly did not give him any pain medication or gauze bandages for his injuries. (Compl., ¶¶ 24-25; Supp. Compl., ¶¶ 23-24).

Plaintiff claims that he subsequently "pleaded with Defendant Boid to be allowed to see a doctor" because he "was going through unimaginable pain from [third] degree burns, nerve damage, and approximately 6 surgeries and acute mental and emotional agony." (Compl., ¶ 26; Supp. Compl., ¶ 25). According to plaintiff, Boid denied his repeated requests to see a doctor and told him that he "shouldn't have came [sic] to jail" and to "shut up." (Compl., ¶ 26; Supp. Compl., ¶¶ 26-27).

Plaintiff alleges that he "was kept in a cell for several hours in excuriating [sic] pain while open burns, doner [sic] sites and skin grafts[,] discharged blood and other bodily fluids." (Compl., ¶ 27; Supp. Compl., ¶ 28). Plaintiff claims that his body is "badly scared [sic] and has legions [sic] from infections," and that other parts of his body have not "completly [sic] healed * * * because of the unsanitary conditions and lack of adaquate [sic] medical care * * * at the NCCC." (Compl., ¶ 27).

In addition, plaintiff alleges that he was not issued any t-shirts or underwear and was given only "two pairs of orange jail suite [sic] outfits," "one camp style wool blanket and two

white sheets to sleep on," all of which became "heavily staturated [sic] with bloody discharge" "[a]fter a couple of hours of [him] tossing and turning and trying to staunch the flow of blood and discharge." (Compl., ¶ 28; Supp. Compl., ¶¶ 29-30). Plaintiff also alleges that his cell was "cold and unsanitary." (Compl., ¶ 28; Supp. Compl., ¶ 31). According to plaintiff, he "remained in this misserable [sic] state for several hours" and no doctor or counselor was ever sent to speak with him or "help him cope with the mental and physical anguish he was going through." (Compl., ¶¶ 28, 29; Supp. Compl., ¶ 32).

Plaintiff alleges that on the following day, September 23, 2009, he was examined by "Kathy," the head nurse at the NCCC medical unit, who admonished "her fellow co-workers for allowing Plaintiff to be left in that condition without being seen by a doctor," issued him new sheets and clothing and called Hues to request "a new sanitary mattress for [plaintiff's] injuries." (Compl., ¶ 33; Supp. Compl., ¶¶ 37-40). According to plaintiff, Hues did not comply with Kathy's request, denying him a sanitary mattress. (Compl., ¶ 33; Supp. Compl., ¶ 40). Plaintiff further alleges that Hues, Boid and Harvey blocked the efforts of Kathy, other nurses and other officers assigned to the medical department to attend to his injuries. (Compl., ¶ 34; Supp. Compl., ¶ 41).

Plaintiff alleges that on September 24, 2009, Hues denied his requests to phone his attorney and to be taken to the medical center for treatment and pain medication. (Compl., ¶¶ 35, 36; Supp. Compl., ¶¶ 43, 44). According to plaintiff, "whenever [he] would ask Defendant Hues to call medical because he didn't get his medication or because he was in pain, Defendant Hues would be extremely negative towards [him] or simply just ignored [his] pleas." (Supp. Compl., ¶ 42).

4

Plaintiff alleges that on September 30, 2009, he was finally sent to the NUMC after he had complained to the Honorable I. Leo Glasser, United States District Judge, during his sentencing the previous day, about the "horrible condition" to which he was being subjected at the NCCC. (Compl., ¶ 37; Supp. Compl., ¶ 48). According to plaintiff, he "was deemed 'not fit for confinement' and held as an inpatient at NUMC," where he was "placed back on pain narcotics and nerve damage medication." (Compl., ¶ 38; Supp. Compl., ¶ 48). Plaintiff claims that he received physical therapy and medical treatment for his open wounds and burns while at NUMC, but he did not receive any "help for the mental anguish he was suffering from." (Compl., ¶ 39). According to plaintiff, on or about October 8, 2009, he was sent back to the NCCC "against his will." (Compl., ¶ 40; Supp. Compl., ¶ 50).

Plaintiff alleges that in or about October 2009, he filed grievances against Hues, Boid and Harvey, but those grievances were never answered, and that on October 8, 2009, those defendants placed him in a cell with "an openly know[n] racsis [sic] inmate" known as "Mikey Blue Eyes" in retaliation for his filing of the grievances. (Compl., ¶¶ 41-42; Supp. Compl., ¶¶ 50-51). Plaintiff claims that "Mikey Blue Eyes" pressured him for his pain medication "so he [could] crush it up and snort it," and that on one occasion when he refused, "Mikey Blue Eyes" assaulted him. (Compl., ¶ 43; Supp. Compl., ¶ 52). According to plaintiff, when Harvey learned of the assault that same day, he did not bring any action against "Mikey Blue Eyes" and instead moved plaintiff to another cell. (Compl., ¶ 43; Supp. Compl., ¶ 53). Plaintiff claims that he filed another grievance against Harvey, Boid and Hues with respect to their retaliation against him, but that grievance was also ignored. (Compl., ¶ 44; Supp. Compl., ¶ 54).

Plaintiff alleges that in or around November 2009, it was the custom of the NCCC to

5

limit prisoners' access to the law library to one (1) hour per week and to "rarely grant[]" any additional time. (Compl., ¶ 51). According to plaintiff, the law library in the main building where he was being housed at that time "was lacking key books" and the books that were available were outdated or had pages missing. (Compl., ¶¶ 52, 55). Moreover, plaintiff claims that essential books "are intentionally kept in a separate area that is unaccessible to prisoners," as a result of which prisoners were required "to stand on a disorderly and unruly line behind a mesh cage enclosing [sic] and rely on law library prison guards to retrieve the information that the prisoners request." (Compl., ¶ 53). Plaintiff further alleges that since the books were provided on a "first come first serve basis," if another prisoner got the book or information first, all other prisoners had to wait at least another week before they could seek access to it again. (Id.) In addition, plaintiff alleges that there are no legal assistants employed at the NCCC and that prisoners' access to computer research is limited. (Compl., ¶¶ 54, 55).

According to plaintiff, "[a]fter numerous complaints, [he] was given physical therapy 1-2 times aweek [sic] but most of the time he was made to choose between going to physical therapy or the law library." (Compl., ¶ 46). Plaintiff alleges that although the physical therapy he received "was better than nothing[,] * * * it was grossly inadequate," resulting in "atrophied peck [sic] muscles," for which he eventually had to undergo surgery. (Compl., ¶ 49). According to plaintiff, had his complaints and grievances been answered "in a timely fashion he would never [have] had to endure another surgery." (Compl., ¶ 50). Plaintiff also claims that he was never given counseling for his post traumatic stress and depression. (Compl., ¶ 46).

Plaintiff alleges that on or about May 5, 2011 [sic], Hues, Boid and Harvey "arbitrarily" had him transferred from the medical unit in NCCC's main building to "E1D unit" in a satellite

building "as a form of retaliation and as a means to deny [him] access to the courts." (Compl., ¶ 47; Supp. Compl., ¶ 56). According to plaintiff, on or about May 20, 2011, he was transferred from the E1D unit to the NUMC, where he underwent "a release for his right chest/shoulder" to help remedy his atrophied pectoral muscles. (Compl., ¶ 48). Thereafter, plaintiff was returned to the medical unit in the main building at the NCCC. (Id.) According to plaintiff, after thirty (30) days "of convalesces [sic]" in the medical unit, he requested to be moved because he "anticipated more retaliatory measures by prison guards" as a result of the grievances he filed against them. (Id.)

Plaintiff alleges that the law library in the satellite building at the NCCC is in even worse condition than the one in the main building, i.e., it does not allow prisoners' access for even one (1) hour per week because prison guards begin timing prisoners from the time they leave their housing units and it can take ten (10) to fifteen (15) minutes before they even get to the law library; key books are missing; and there is no employee working there who is "knowledgable [sic] about the law and that can assist [him]." (Compl., ¶¶ 60, 64, 67).

Plaintiff alleges that his "numerous grievances" complaining of "the inadequate time he was being afforded [sic] at the law library, the substandard condition that th[e] law library was in and * * * [his] need [for] physical therapy" were either ignored or the answers thereto failed to address his concerns. (Compl., ¶¶ 45, 57, 59, 80; Supp. Compl., ¶ 55). According to plaintiff, on August 12, 2010, he sent a certified letter to Sposato after his grievances filed with the IGU were ignored, but Sposato also ignored his "pleas and concerns about the [IGU]'s misconduct." (Compl., ¶¶ 81-82, Exhibit; Supp. Compl., ¶¶ 63-64). Plaintiff also claims that he was denied his right to appeal a decision of the IGU. (Compl., ¶ 58).

7

Plaintiff further alleges that on or about August 12, 2010, Vega ordered him to remove his "state issued coofie" from his head, but did not tell inmates of other religions to remove their religious articles. (Compl., ¶ 83; Supp. Compl., ¶ 65). In addition, plaintiff alleges that on or about September 16, 2011 [sic], in accordance with the custom at the NCCC, Khal issued all inmates an ultimatum to either attend religious services or go to their recreation period. (Compl., ¶¶ 84-85).

Plaintiff further alleges that the NCCC violated a court order issued by the Honorable C. Randel Henricks on November 15, 2010 granting him access to the law library at the NCCC for five (5) hours per week, and that he only receives access to the law library for an average of three (3) hours per week. (Compl., ¶¶ 61-63; Supp. Compl., ¶ 59). In addition, plaintiff claims that in December 2011 [sic], and for "many times through out [sic] his extended confinement at the NCCC," he was forced to choose between going to the law library or to his one (1) hour per week recreation period. (Compl., ¶¶ 65-66).

Plaintiff alleges that on or about November 15, 2011 [sic], information regarding Islamic Law that his mother had downloaded from the internet and sent to him was returned to her with an explanation that all books had to be sent by the publisher. (Compl., ¶ 92). According to plaintiff, other information not concerning Islamic Law that had been downloaded from the internet and sent to him had not been returned to the sender and after his mother had attempted to send him the information on Islamic Law he started having problems and long delays with his mail. (Compl., ¶ 93). Plaintiff further claims that the NCCC mail room "randomly rejects religious muslim [sic] information without authority to do so." (Supp. Compl., ¶ 69).

In addition, plaintiff alleges that from December 23, 2010 until January 13, 2011, he "was

8

held back from religious services," which "disrupts the entire services" of the Islamic community in the satellite building of the NCCC because he is the Imam. (Compl., ¶¶ 86-87). According to plaintiff, Khal responded to his complaints by stating: "You *muslims* are terrorist [sic] and lucky that we let you go in the first place." (Compl., ¶ 87 (emphasis in original); Supp. Compl., ¶ 67). Plaintiff further alleges that when he complained about Khal's remark to Hardy, Hardy told him that Khal was entitled to his own opinion and stated that if he "had any say so in the matter all of you *muslims* would be labled [sic] as gang members- not a religion," (Compl., ¶ 88) (emphasis in original), and/or that if he "had any say so in the matter all you muslims [sic] would get rounded up and nuked [sic]," (Supp. Compl., ¶ 68). Plaintiff claims that his grievance complaining of religious harassment was ignored. (Compl., ¶ 90). According to plaintiff, the administration at the NCCC "is anti-islamic [sic] and dose [sic] not offer the same privillegs [sic] it offers to other religions * * * at the NCCC such as study class and religious diets," and that "[a]ll efforts to move for religious equality has [sic] been ignored * * *." (Compl., ¶ 91; see Supp. Compl., ¶ 66).

Plaintiff alleges that on or about February 24, 2011, he complained to "Officer G" about a tray of food that did not have meat, when other trays did. (Compl., ¶ 95). According to plaintiff, Hardy then whispered something to "Officer G," following which "Officer G" told plaintiff to "get lost!" (Compl., ¶ 95). When plaintiff later requested to speak to Hardy's superior "about the food situation," Hardy became "beligerant [sic]" and refused to provide plaintiff with a grievance form. (Compl., ¶¶ 96-97; Supp. Compl., ¶ 70). Plaintiff eventually received a grievance form from another officer. (Compl., ¶ 97; Supp. Compl., ¶ 70). According to plaintiff, on or about March 11, 2011, a grievance officer told him that the matter could not be handled by

9

the IGU and would be forwarded to the internal affairs unit, but he was never contacted by anyone from internal affairs and never heard anything else about this matter. (Compl., ¶ 98; Supp. Compl., ¶¶ 71-72).

Plaintiff alleges that on or about March 14, 2011, "Officer, Badge No. 2783," together with other unidentified officers, retaliated against him by taking his legal work, (Compl., ¶ 99; Supp. Compl., ¶ 73); that on or about March 24, 2011, Anderson ordered him to take off his religious head wear and told him that he could not wear it to a visit, (Compl., ¶ 100; Supp. Compl., ¶ 74); that on or about March 25, 2011, he broke his right hand playing hand ball but was not brought to the NUMC for surgery until eighteen (18) days later, (Compl., ¶¶ 101-104; Supp. Compl., ¶¶ 75-77); that the NCCC "never kept [his] appointment" for a follow up visit at the NUMC scheduled for April 30, 2011, (Compl., ¶ 105; Supp. Compl., ¶ 78); and that as of May 31, 2011, no nurse or doctor at the NCCC had seen him for the "extreme plain [sic]" in his hand, nor had he received any physical therapy therefor, (Compl., ¶ 107; Supp. Compl., ¶ 79).

Plaintiff also complains that the food served to prisoners at the NCCC "is usually luke warm [sic] and some times [sic] cold," "is poorly prepared" and is unhealthy, (Compl., ¶ 68; Supp. Compl., ¶ 60); that the trays upon which the food is served are "unsanitary," (Compl., ¶ 68; Supp. Compl., ¶ 60); that the prisoners are served "small portions of important food," which "causes many fights and arguements [sic] with prisoners," (Compl., ¶ 69); that the housing units are "extremely cold," "filthy" and "rodent and insect infested," (Compl., ¶¶ 70-71, 75; Supp. Compl., ¶ 62); that he was assigned to a cell which had no running hot water and vents from which "a stagnant, cold current" was expelled, (id.); that it is customary at the NCCC to make prisoners wait two (2) hours after their recreation period before they can shower, (Compl., ¶ 73);

10

that "there is never any certainty that the showering water will be war[m] or cold" and there can

be no hot water for showers "for weeks at a time," (Compl., ¶ 74); that "[t]here have been leaks

from th[e] roofs and floods in the cells from waste drain pipes," (Compl., ¶ 76); and that the

commissary does not sell "any healthy alternative foods," (Compl., ¶ 77), and is "grossly

overpriced for low budget items," (Supp. Compl., ¶ 61; see Compl., ¶ 79).

Plaintiff seeks, *inter alia*: (1) judgment declaring that defendants violated his

constitutional rights; (2) prosecution of defendants "to the fullest extent of the law;" (3) review

of the treatment of prisoners and conditions existing at the NCCC by "an independent pannel

[sic] of experts;" (4) various injunctions compelling defendants, *inter alia*, to provide better food,

to charge reasonable prices and provide healthy food at the commissary, to provide hot running

water in all cells, to stop discriminating against Muslims and to provide them with "halla foods

and Islamic periods," to provide him with therapy immediately, to stop denying him access to the

courts, to return his legal work and personal mail and to stop retaliating against him; (5) and

monetary damages in the amount of "55,000,000.00 (Fifteen Million dollars) [sic]." (Compl., at

¶¶ 108- 114, 116, 118 - 120).


III.    Discussion

A.      *In Forma Pauperis* Application

Plaintiff's financial status, as set forth in the declaration in support of his application,

qualifies him to commence this action without prepayment of the filing fee. See 28 U.S.C. §

1915(a)(1). Accordingly, the application to proceed *in forma pauperis* is granted.

B.      Appointment of Counsel

11

28 U.S.C. § 1915(e)(1) provides that a "court may request an attorney to represent any person unable to afford counsel." A district court possesses substantial discretion to determine whether the appointment of counsel for civil litigants is appropriate, "subject to the requirement that it be guided by sound legal principle." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 171–72 (2d Cir.1989) (quoting Jenkins v. Chem. Bank, 721 F.2d 876, 879 (2d Cir.1983)).

When deciding whether to assign counsel to an indigent civil litigant under 1915(e)(1), the threshold inquiry is whether there is "some likelihood of merit" to the litigant's position. Cooper, 877 F.2d at 174; see also Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010); Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001); Hodge v. Police Officer, 802 F.2d 58, 59 (2d Cir. 1986). "[C]ounsel should not be appointed in a case where the merits of the indigent's claim are thin and his chances of prevailing are therefore poor." Carmona, 243 F.3d at 632. If the Court finds that there is some likelihood of merit to the litigant's position, it should next consider:

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Hodge, 802 F.2d at 61–62; Johnston, 606 F.3d at 41–42; Carmona, 243 F.3d at 632. None of the factors are controlling and "[e]ach case must be decided on its own facts." Hodge, 802 F.2d at 61.

The appointment of counsel is not warranted at this stage of the litigation, since, *inter alia*: (1) plaintiff has adequately and competently set forth his claims in his complaint and

12

supplemental complaint; (2) the legal issues presented in this case do not appear to be particularly complex; and (3) there is no special reason to appoint counsel at this time.  Plaintiff may renew his application for the appointment of counsel when this case is trial ready.


       C.      The Prison Litigation Reform Act

Under 28 U.S.C. § 1915A, a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or employee of a governmental entity." 28 U.S.C. § 1915A.  Upon review, a district court shall dismiss a prisoner complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007); see also Liner v. Goord, 196 F.3d 132,134 & n.1 (2d Cir. 1999) (noting that under the Prison Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is not only permitted but mandatory).

Likewise, the *in forma pauperis* statute requires a district court to dismiss an *in forma pauperis* complaint if the action is frivolous or malicious; fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B)(i-iii).  See Abbas, 480 F.3d at 639 (finding both Section 1915 and Section 1915A to be applicable to a prisoner proceeding *in forma pauperis*); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (accord).

It is axiomatic that district courts are required to read *pro se* complaints liberally, see Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting Estelle v.

Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010), and to construe them "'to raise the strongest arguments that [they] suggest[].'" Chavis, 618 F.3d at 170 (quoting Harris v. City of New York, 607 F.3d 18, 24 (2d Cir. 2010)). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 124 (2d Cir. Sept. 2010); see also Jackson v. Birmingham Board of Education, 544 U.S. 167, 171, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).

> D.      Section 1983

Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects, or causes to
> be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. To state a Section 1983 claim, a plaintiff must allege that the challenged conduct was "committed by a person acting under color of state law," and that the conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)). Section 1983 does not create any independent substantive rights; but rather is a vehicle to "redress . . . the deprivation of [federal] rights established elsewhere." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999) (citing Okla. City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)).

> 1.      Claims Against Gehi, O'Kanta, Edwards, Miller, Camanitti and the Food
>         Administration Supervisor

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004)(internal quotations and citation omitted); see also Platt v. Incorporated Village of Southampton, 391 Fed. Appx. 62, 65 (2d Cir. Aug. 30, 2010); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). "Personal involvement" may be established by evidence of direct participation by the defendant in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Hayut, 352 F.3d at 753; see also Rolon v. Ward, 345 Fed. Appx. 608, 611 (2d Cir. Sept. 4, 2009). "The fact that [a defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989); see also Back, 365 F.3d at 127. A complaint based on a violation under Section 1983 that does not allege facts establishing the personal involvement of a defendant fails a matter of law. See Costello v. City of Burlington, 632 F.3d 41, 48-49 (2d Cir. 2011); Rosa R. v. Connelly, 889 F.2d 435, 437 (2d Cir. 1989).

Plaintiff has not alleged the direct participation of Gehi, O'Kanta, Edwards, Miller, Camanitti or the Food Administration Supervisor in any of the wrongdoing alleged in his complaints, or any basis upon which to find any of those defendants liable in a supervisory capacity. Accordingly, plaintiff's claims against Gehi, O'Kanta, Edwards, Miller, Camanitti and the Food Administration Supervisor are dismissed in their entirety with prejudice **unless**

15

**plaintiff files an amended complaint alleging the personal involvement of those defendants in the alleged constitutional deprivations within thirty (30) days from the date this Order is served with notice of entry upon him.**

2.      Claims against the NCCC

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002); see also In re Dayton, ___ F.Supp.2d ___, 2011 WL 2020240, at * 7 (S.D.N.Y. Mar. 31, 2011); Hawkins v. Nassau County Correctional Facility, ___ F.Supp.2d ___, 2011 WL 441798, at * 1 n. 1 (E.D.N.Y. Feb. 8, 2011); Carthew v. County of Suffolk, 709 F.Supp.2d 188, 195 (E.D.N.Y. 2010).  Since the NCCC is an administrative arm of Nassau County, without a legal identity separate and apart from the County, it lacks the capacity to be sued.  Accordingly, plaintiff's claims against the NCCC are dismissed in their entirety with prejudice.[5]  However, since plaintiff is proceeding *pro se*, his claims against the NCCC will be construed as claims against the County and the caption of the complaint shall be amended accordingly.

3.      Claims against the NHCC

Public benefit corporations, such as the NHCC, are municipal entities for the purpose of

---

[5] To the contrary, the NHCC is expressly delegated with the power to sue or be sued. N.Y. Pub. Auth. Law § 3404(1) and, thus, is a separate and distinct entity from the County capable of being sued.  See, e.g. Foster Wheeler Broome Couny, Inc. v. County of Broome, 275 A.D.2d 592, 595, 713 N.Y.S.2d 92 (3d Dept. 2000); Facilities Development Corp. v. Miletta, 246 A.D.2d 869, 870-71, 667 N.Y.S.2d 805 (3d Dept. 1998).

Section 1983.  See, e.g. McGrath v. Nassau Health Care Corp., 217 F.Supp.2d 319, 330

(E.D.N.Y. 2002) ("Public benefit corporations are governmental entities for Section 1983's

purposes."); Estes-El v. New York State Department of Motor Vehicles Office of Administrative

Adjudication Traffic Violation Bureau, No. 95 Civ. 3454, 1997 WL 342481, at * 4 (S.D.N.Y.

June 23, 1997) (holding that the liability of a public benefit corporation under Section 1983 "is

governed by the principles set forth in Monell * * * and its progeny."); Sewell v. New York City

Transit Authority, Nos. CV-90-3734, CV-91-1274, 1992 WL 202418, at * 2 (E.D.N.Y. Feb. 10,

1992) ("The 'policy or custom' requirement of Monell applies to public corporations as well as

to municipalities. * * * Hence, in order to maintain a cause of action under Section 1983 against

[a public benefit corporation], the plaintiff must plead that an impermissible 'policy or custom'

of that public benefit corporation denied him his federal rights."); see also Dangler v. New York

City Off Track Betting Corporation, 193 F.3d 130, 142-43 (2d Cir. 1999) (applying Monell to

claims against the OTB, a public benefit corporation).  "Accordingly, to maintain actions brought

under Section 1983 against public benefit corporations, plaintiffs must show that those

corporations maintained a custom or policy that deprived them of a constitutional right."

McGrath, 217 F.Supp.2d at 330; see also Connick v. Thompson, 131 S.Ct. 1350, 1359

("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove

that 'action pursuant to official municipal policy' caused their injury." (quoting Monell v.

Department of Social Services of City of New York, 436 U.S. 658, 690-1, 98 S.Ct. 2018, 56

L.Ed.2d 611 (1978)); Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008), cert. denied, 130

S.Ct. 95, 175 L.Ed.2d 234 (2009) (holding that in order to prevail on a Section 1983 claim

against a municipal entity or public benefit corporation, a plaintiff must show: "(1) actions taken

17

under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality [or public benefit corporation] caused the constitutional injury.")

Plaintiff has not alleged any "injury to a constitutionally protected right * * * that * * * was caused by a policy or custom of the [NHCC] responsible for establishing final policy." Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008) (internal quotations and citation omitted). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S.Ct. at 1359. In addition, "[i]n limited circumstances, a [municipal entity's or public benefit corporation's] decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983." Id. "To satisfy [Section 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." Id. (internal quotations, alterations and citation omitted).

Plaintiff has not alleged: (1) the existence of a formal policy which is officially endorsed by the NHCC; (2) actions taken or decisions made by NHCC officials with final decision-making authority which caused the alleged violations of his civil rights; (3) a NHCC practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of its policymaking officials; or (4) a failure by NHCC policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with its employees. Accordingly,

18

plaintiff's claims against the NHCC are dismissed with prejudice **unless plaintiff files an amended complaint stating a plausible <u>Monell</u> claim against the NHCC within thirty (30) days from the date this Order is served with notice of entry upon him.**[6]

4.     Claims Concerning Commissary Pricing and Selection

Plaintiff claims that the prison commissary does not sell any healthy foods and is "grossly overpriced for low budget items." (Supp. Compl., ¶ 61; <u>see</u> Compl., ¶¶ 77-79).  However, since "there is no constitutional right to access a prison commissary," <u>Mitchell v. City of New York</u>, No. 10 Civ. 4121, 2011 WL 1899718, at * 2 (S.D.N.Y. May 13, 2011); <u>see also</u> <u>Davis v. Shaw</u>, No. 08 Civ. 364, 2009 WL 1490609, at * 1 (S.D.N.Y. May 20, 2009), "prices and product selections offered by prison food vendors cannot give rise to a constitutional violation." <u>Mitchell,</u> 2011 WL 1899718, at * 2; <u>see also</u> <u>Davis</u>, 2009 WL 1490609, at * 1 (finding that the plaintiff's complaints regarding the prices and selection at the prison commissary did not state a constitutional violation).  Accordingly, plaintiff's claims regarding commissary pricing and selection are dismissed with prejudice pursuant to 28 U.S.C. §§ 1915 and 1915A for failure to state a claim.`

5.     Claims Against "Officer G" and "Officer, Badge No. 2783"

---

[6] To the contrary, plaintiff's allegations, *inter alia*, that the NCCC maintained customs: (1) limiting prisoners' access to the law library, certain books in the law library and computer research; (2) requiring prisoners to choose between attending religious services or recreation periods; (3) discriminating against privileges offered to Muslims; and (4) requiring prisoners to wait two (2) hours after their recreation period before showering, are arguably sufficient at the pleadings stage to state a <u>Monell</u> claim against the County.

19

The Second Circuit has held that district courts must provide incarcerated *pro se* litigants with reasonable assistance in investigating the identity of unidentified defendant officers. See Valentin v. Dinkins, 121 F.3d 72 (2d. Cir.1997) (per curiam). Accordingly, it is hereby ordered that the Clerk of the Court serve a copy of this Order on the Nassau County Attorney and that **within thirty (30) days of the date this Order is served upon it**, the Nassau County Attorney's Office: (1) attempt to ascertain the identities of "Officer G" and "Officer, Badge No. 2783"; and (2) provide that information, together with the address(es) at which each such employee can be served, to the Court. Once the information is provided to the Court by the Nassau County Attorney's Office, plaintiff's complaint shall be deemed amended to reflect the full names of "Officer G" and "Officer, Badge No. 2783," summonses shall be issued as to those defendants and the United States Marshal Service shall serve those defendants.

IV.     Conclusion

For the foregoing reasons, it is hereby:

ORDERED that plaintiff's application to proceed *in forma pauperis* is granted; and it is further,

ORDERED that plaintiff's application for the appointment of *pro bono* counsel is denied without prejudice to renewal when this case is trial ready; and it is further,

ORDERED that plaintiff's claims against the NHCC, s/h/a the NUMC; Miller, s/h/a the IGU Sergeant; Camanitti, s/h/a the Mail Room Sergeant, Law Library Sergeant, Housing Unit Maintenance Supervisor and Commissary Supervisor; the Food Administration Supervisor; O'Kanta; Gehi; Edwards; and the NCCC, as well as his claims relating to the pricing and

20

selection at the NCCC's commissary, are *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. §§ 1915 and 1915A, for failure to state a claim, **unless plaintiff files an amended complaint in accordance with this Order within thirty (30) days from the date this Order is served with notice of entry upon him**, and that the complaint shall be amended to substitute the County of Nassau for the NCCC; and it is further,

ORDERED that the Clerk of Court: (a) issue summonses as to defendants County of Nassau, Sposato, Hues, Boid, Harvey, Kahl, Vega, Hardy and Anderson, (b) serve a copy of this Order, together with courtesy copies of the summonses and complaint, upon the Nassau County Attorney and (c) pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, serve notice of entry of this order upon all parties in accordance with Rule 5(b) of the Federal Rules of Civil Procedure, including mailing a copy of this order to plaintiff's address of record pursuant to Rule 5(b)(2)(C); and it is further,

ORDERED that the United States Marshal Service serve the summonses and complaint, together with a copy of this order, upon defendants County of Nassau, Sposato, Hues, Boid, Harvey, Kahl, Vega, Hardy and Anderson without prepayment of the filing fee; and it is further,

ORDERED that **within thirty (30) days of the date this Order is served upon it**, the Nassau County Attorney's Office shall attempt to ascertain the identities of "Officer G" and "Officer, Badge No. 2783" and provide that information, together with the address(es) at which each such employee can be served, to the Court; and it is further,

ORDERED that once the information regarding the identities and addresses of "Officer G" and "Officer, Badge No. 2783" is provided to the Court by the Nassau County Attorney's Office, plaintiff's complaint shall be deemed amended to reflect the full names of "Officer G"

21

and "Officer, Badge No. 2783," summonses shall be issued as to those defendants and the United State Marshal Service shall serve the summonses and complaint, together with a copy of this order, upon those defendants without prepayment of the filing fee.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).

SO ORDERED.

_____
Sandra J. Feuerstein
United States District Judge

Dated:       September 8,  2011
             Central Islip, New York

22